**Barbara C. EHRLICH, Plaintiff–Appellant,**

**v.**

**TOWN OF GLASTONBURY, Joel White, James Kenny, Defendants–Appellees.**

**Docket No. 02–7839.**

United States Court of Appeals, Second Circuit.

Argued: July 18, 2003.

Decided: Oct. 17, 2003.

tion over the appeal on the basis of his un-                timely March 12, 2001, petition to this Court.

Gordon Bednarz, East Hartford, CT (Barbara Ehrlich, pro se, on the brief), for Plaintiff–Appellant.

James V. Somers, Halloran & Sage LLP, Hartford, CT (Brian P. Leaming, Erik J. Ness, on the brief), for Defendants–Appellees.

Before: CALABRESI, RAGGI, and WESLEY, Circuit Judges.

CALABRESI, Circuit Judge.

In August 2000, plaintiff-appellant Barbara Ehrlich filed a § 1983 action against defendant police officers Joel White and James Kenny in their individual capacities. She asserted that these officers, while acting in the scope of their employment with the Town of Glastonbury, violated her Fourth Amendment rights by unlawfully entering her home and using unreasonable force against her person. Her complaint also alleged a variety of state tort law claims against the individual defendants and the Town of Glastonbury, and sought compensatory and punitive damages. After two days of testimony before a jury, the defendants moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a). The district court (Goettel, *J.*) granted a directed verdict as to Ehrlich's claims of unlawful entry, negligence, assault, intentional infliction of emotional distress, and her request for punitive damages. Her unreasonable force claim was submitted to the jury, which found in favor of the defendants. On appeal, Ehrlich argues that the district court erred in partially granting the defendants' motion for a directed verdict. We affirm, on the merits, the district court's decision with regard to the state law and punitive damages claims. We affirm, on a finding of qualified immunity, the district court's decision with regard to the Fourth Amendment claim.

*Background*

Prior to the incident that gave rise to this suit, Ms. Ehrlich resided with her

father, Mr. Benjamin Ehrlich, at 202 Wickham Road in Glastonbury. In July 1998, Mr. Ehrlich was removed from the home by the Connecticut Department of Social Services and declared incompetent by the Glastonbury Probate Court.[1] That court appointed Attorney William Roberto as the temporary conservator of his estate, and Ms. Ehrlich's sister, Lorraine Hennig, as temporary conservator of his person. Acting as conservator, Mr. Roberto signed a letter authorizing Ms. Hennig, her attorney Thomas Kane, Mr. Ehrlich's appointed attorney Peter Sterling, and social worker David Parsons, to enter the Wickham Road residence "for the purpose of removing any and all personal belongings of my ward who is relocating to Florida. . . ." In the letter, Mr. Roberto also gave permission to those named to "use whatever means necessary including breaking locks, doors or windows to gain entrance."

On August 20, 1998, Ms. Hennig, Mr. Kane, Mr. Sterling, and Mr. Parsons went to Mr. Ehrlich's Wickham Road home to retrieve his belongings. They were accompanied by Officer White, whose presence was requested by Parsons. Defendants concede that they did not have a warrant to search the premises. What happened once they got to the residence, however, is a matter of sharp dispute between the parties. First, the parties disagree about how Mr. Parsons and the others with him entered the house. Plaintiff alleges that the officers "forcibly broke into and entered" her home. She testified at trial that on the morning of August 20, 1998, she heard loud knocking on the back-door and then the voice of "one of the policemen" saying "we want to come in." Ehrlich responded that she "did not want

anybody to come in," but the knocking continued and, after approximately ten minutes, the policeman said "we're not waiting any longer." During cross examination, Ehrlich testified that she did not recall precisely how the Parson group gained entry to the home, but speculated that one of them had broken the "flimsy snap lock" on the door through repeated banging. She stated that she "would not have voluntarily opened the door."

By contrast, Officer White testified at trial that he knocked on the door for a period of time, exchanged words with Ehrlich, and then entered the dwelling *only after* Ehrlich opened the door.[2] Both White and Kenny indicated through testimony that they believed they had authority to assist Mr. Parsons and his party in entering the house and removing Mr. Ehrlich's belongings. Officer White stated that the request for police escort in these circumstances was typical, and that he had received a copy of the letter from Mr. Roberto authorizing entry. He further stated that he was aware that DSS had "full legal authority over [Mr. Ehrlich's] person." Similarly, Kenny testified that he learned from White that the group had authority from "the attorneys" to retrieve belongings.

Once inside the home, according to Ehrlich, the police officers seized articles of her personal property and "physically assault[ed]" her, causing her "naked body to be displayed" to third parties then present. She testified that when she objected to the seizure of a particular document, one of the officers grabbed her by the upper arms and caused her to "pass[ ] out for a bit." When she "came to," she discovered

---

1. The record states that there was some evidence of elder abuse at the Ehrlich's home.

2. Sergeant Kenny testified that he proceeded to the house in response to a call from White indicating that Ehrlich was uncooperative. The parties were already inside the house when he arrived on the scene.

that she had "slumped down" while her shirt was pulled up, exposing her breast to plain view. After the officer released her, she dialed 911 in an effort to bring other law enforcement personnel to the scene. According to plaintiff, the officers told the 911 operator to disregard the call, and she left the house because she was too frightened to remain inside. Later, Lieutenant Clifford Cox arrived and spoke with Officer White and Sergeant Kenny. He told Ehrlich she was lucky they did not arrest her.

White testified that Ehrlich had proven extremely disruptive, objecting to the removal of any item and blocking people from moving freely in the house. Kenny testified that Ehrlich attempted to grab a document out of Mr. Sterling's hands, at which point he "lightly placed" his hands "on the back of her arms." She began to fall, he stated, so he grabbed her upper arm to hold her up, but she collapsed to the ground in a sitting position. According to Kenny, he then noticed he was holding her shirt, and immediately released his grip. He did not learn until later that her breast had been exposed to view. While still at the premises, Kenny requested that his supervisor respond to the situation because he "knew down the road there was going to be a problem."

*The District Court's Decision*

After the incident, Ehrlich filed suit in district court on claims of (1) illegal entry into a dwelling; (2) assault; (3) intentional infliction of emotional distress; (4) negligence (including negligent infliction of emotional distress); and (5) violation of her constitutional right to be free from the use of unreasonable force.[3] Only this last claim went to the jury, which found for defendants. The rest were resolved in favor of defendants on a judgment as a matter of law, orally granted by the district court. *See* Fed.R.Civ.P. 50(a). The court also ruled out, as a matter of law, the plaintiff's request for punitive damages pursuant to § 1983.

On Ehrlich's federal law claim of unlawful entry, the court found that "the conservator had the right to enter the property and obtain the father's property, and he had the right to have others do it for him." As to intentional infliction of emotional distress, the court concluded that Ehrlich had "not shown emotional distress to the extend required by the Connecticut courts." Her negligence claim failed, the court ruled, because there was not "adequate proof of negligence." And the court dismissed her common law assault claim "per se."[4] With regard to punitive dam-

**3.** In her complaint, the plaintiff made a claim which can be read as asserting that defendants, by threat of arrest, illegally aided the conservator's agents in seizing property that was hers rather than her fathers. In her argument before the district court, however, plaintiff does not seem to treat this as a separate claim, but rather only as relevant to whether the initial entry was legal. The district court apparently treated it as such in its judgment which granted a directed verdict "as to unlawful entry" but did not mention illegal seizure. On appeal, plaintiff, now *pro se*, mentions the matter again. Here also she raises it only in the context of whether the entry was legal. She does not identify it as an independent claim. In contrast, she specifi-

cally asserts in her brief that the trial court failed to rule on her allegedly separate claim of negligent infliction of emotional distress. Under the circumstances, and keeping in mind the fact that if one of plaintiff's claims has not yet been decided or been abandoned, plaintiff's appeal would be interlocutory, we treat any separate claim for seizure of property as having been abandoned.

**4.** The Town of Glastonbury, as employer of defendants White and Kenny, was a defendant only with regard to plaintiff's state law claims. In dismissing all of the state law claims against defendant officers, the district court also dismissed all claims against the town.

ages, the court held that "[t]his case does not come even vaguely close to warranting punitive damages." On appeal, Ms. Ehrlich does not contest the jury verdict; she challenges, however, the district court's judgment with respect to all except her assault claim.

## Discussion

This court reviews the grant of a judgment as a matter of law *de novo,* applying the same standard as the district court. *Moretto v. G & W Elec. Co.,* 20 F.3d 1214, 1219–20 (2d Cir.1994). A directed verdict is granted only when, viewing the evidence in the light most favorable to the non-moving party, "there can be but one conclusion as to the verdict that reasonable persons could have reached." *Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 494 (2d Cir.1995) (citations omitted). *See also* Fed.R.Civ.P. 50(a)(1) (stating that a directed verdict is proper when "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving] party on that issue").

## Plaintiff's State Law Claims

■ With this standard of review in mind, it is clear that the district court was correct in granting a directed verdict in favor of the defendant police officers and the Town of Glastonbury on the plaintiff's state law claims and request for punitive damages. Her punitive damages request fails because she has offered no evidence, as required to obtain such damages in § 1983 actions, that defendant's conduct was driven "by evil motive or intent" or by "reckless or callous indifference" to the rights of others. *Smith v. Wade,* 461 U.S.

30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *see also Mathie v. Fries,* 121 F.3d 808, 815 (2d Cir.1997) (quoting *Smith*). With regard to intentional infliction of emotional distress, plaintiff has not even approached the requisite showing that defendants' conduct was so "extreme and outrageous" as to "exceed[ ] all bounds usually tolerated by decent society." *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 443, 815 A.2d 119 (2003).

■ As to her negligence claim, Ehrlich has not alleged facts that rise to a breach of any duty of care the police officers owed her. *See Baptiste v. Better Val–U Supermarket, Inc.,* 262 Conn. 135, 138, 811 A.2d 687 (2002) (setting forth the requirements for proving negligence). In advancing her negligence claim with respect to physical injury, she asserts only one affirmative act undertaken by the officers: namely, that they grabbed her by the arms to restrain her. This, without more, does not amount to a breach of duty of care. And with respect to any alleged emotional distress, the conduct in question did not "create[ ] an unreasonable risk of causing the plaintiff emotional stress." *Carrol,* 262 Conn. at 444, 815 A.2d 119. Moreover, plaintiff did not allege emotional distress "severe enough that it might result in illness or bodily harm." *Id.* We therefore affirm the district court's judgment as to her claim of negligence.[5]

## Plaintiff's Unlawful Entry Claim

Ehrlich's Fourth Amendment claim is a more complicated matter. The district

---

**5.** Ehrlich's argument that the court failed to rule on a more specific negligent infliction of emotional distress claim is unavailing. The district court, "constru[ing] the allegations liberally in the complaint" identified a broad negligence claim and granted the motion to dismiss "as to negligence." In her complaint, plaintiff alleged that the defendants were "negligent in the following respects," including that they should have known that their behavior would cause physical injury and emotional distress. The court determined that no negligence on the part of defendants led to any alleged injury—whether physical or emotional—and correctly dismissed the negligence claim *in toto.*

court's grant of a directed verdict was based on the proposition that the conservator "had the right to enter the property and have others do it for him." In other words, the warrantless search at issue in this case was justified by appropriate third-party authorization; specifically, the letter signed by Attorney William Roberto, Mr. Ehrlich's conservator, permitting certain named individuals to enter and search the Wickham Road home. *See Illinois v. Rodriguez*, 497 U.S. 177, 179, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) ("[A] warrantless entry ... does not violate the Fourth Amendment[] ... if the officers have obtained the consent of a third party who possesses common authority over the premises."). The plaintiff claims the district court erred in treating Mr. Roberto as an appropriate third-party capable of giving consent, and further asserts that the officers should have known that they did not have proper authorization to enter the home. To assess these contentions, we first examine the governing law of third-party consent in the Fourth Amendment context, and then turn to whether the two officers had qualified immunity.

## A. The applicable law

It is well-settled in this circuit that "third party consent to a search will validate the search if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." *United States v. Davis*, 967 F.2d 84, 87 (2d Cir.1992). Without valid consent, a warrantless entry of the sort before us would be *"per se* unreasonable under the Fourth Amendment," and Ms. Ehrlich would prevail. *See Koch v. Town of Brattleboro*, 287 F.3d 162, 166 (2d Cir.2002). In assessing whether a violation of Ms. Ehrlich's Fourth Amendment rights occurred, then, we must determine whether Mr. Roberto meets the requirements set forth in *Davis*.

While the appropriate test for third-party consent is clear, its application in this case is not. Preliminarily, we note that no case in this circuit has delimited the requisite "access" necessary to satisfy the first prong of the *Davis* test. In this case, the third party on whose consent the government relies was Mr. Roberto, a court-appointed conservator. Mr. Roberto, in turn, gave those named in his letter permission to *break into* Mr. Ehrlich's home over the objections of the resident plaintiff. Whether or not this satisfies the access prong of *Davis* depended on the degree of authority conferred to conservators under Connecticut law, specifically, whether *state* law authorizes forcible entry by the conservator even where the residence in question is also in part possessed by an individual who refuses entry.

Unfortunately, the degree of authority given to conservators to enter a jointly occupied home has not been definitively decided by Connecticut courts. Defendants cite only two Connecticut cases to justify their assertion that, as a matter of state law, Mr. Roberto possessed sufficient authority over the premises to direct Mr. Parsons' party and the police officers forcibly to enter the Wickham Road house. The first is an 1861 case, *State v. Hyde*, which held that a conservator has a right to enter his ward's home to inventory and manage his property. 29 Conn. 564, 569, 1861 WL 1047 (1861). In *Hyde*, the objecting party appears to have been the ward himself, and the court relied on the notion that the ward is "incapable of managing his property." *Id.*

The second is an appellate court case of more recent vintage, which itself relies on *Hyde. Zanoni v. Hudon*, 42 Conn.App. 70, 678 A.2d 12 (1996). *Zanoni* similarly holds that a conservator's entry upon the

property of his ward in order to carry out his duties is proper, and does not amount to trespass. *Id.* at 75–76, 678 A.2d 12.[6] But in *Zanoni*, the ward's daughter claiming illegal entry did not reside in the house in question. Indeed, the court relied in part on the trial court's express finding "that although the plaintiffs made weekend visits to the property and performed numerous maintenance tasks, these actions did not rise to the level of exclusive possession." *Id.* at 74, 678 A.2d 12.[7] The court concluded that the plaintiff "had neither title nor possession upon which to base an action in trespass." *Id.* at 76, 678 A.2d 12. Since 1861, the Connecticut Supreme Court has not spoken on the scope of the power of conservators to enter the homes of their wards.[8]

Thus, we are left without clear precedential guidance—state or federal—on (a) whether some amount of physical force is permissible under the access prong of *Davis*, and, as a related matter, whether state law permits conservators to authorize that force; and (b) more generally, whether Connecticut law confers authority on conservators to enter, even non-forcibly, the home of their ward when it is jointly occupied by another individual. Absent such guidance, resolving the question of whether a Fourth Amendment violation occurred is a difficult exercise.

### B. Qualified immunity

Despite the foregoing, defendants urge us to find, as the district court did, that the

law is *not* ambiguous and that no Fourth Amendment violation occurred. To the extent that there is ambiguity, however, they proffer an alternative argument: they are at least entitled to qualified immunity because Ehrlich has not demonstrated the violation of a *clearly-established* constitutional right. *See Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir.1999) ("The doctrine of qualified immunity shields police officers acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their actions violate clearly-established rights of which an objectively reasonable official would have known.") (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). If such immunity applies, a dismissal of the plaintiff's claim as a matter of law is, of course, required.

### 1. The Supreme Court's prescribed inquiry

Defendants begin and end their qualified immunity argument with the proposition that the allegedly infringed constitutional right is not "clearly established." As our previous discussion of the uncertainty of any Fourth Amendment violation indicates, this position seems fair enough. Nonetheless, it fails to take account of the governing Supreme Court holdings on the appropriate structure of a qualified immunity inquiry. In *Saucier v. Katz*, the Supreme Court ruled that the "requisites of a qualified immunity defense must be con-

---

6. *See* Conn. Gen.Stat. § 45a–655(a): The conservator of the estate is required to manage the estate, including filing an inventory of property after having the property appraised.

7. The residence at issue in *Zanoni* appears to have been a vacation home.

8. The Connecticut Supreme Court has more recently established the scope of *other* powers of conservators, including entry into leases.

*See Stempel v. Middletown Trust Co.*, 127 Conn. 206, 222, 15 A.2d 305 (1940) (noting that a conservator can make a lease of the ward's property, "that power being implied in the statutory provision that he should have charge of and manage the estate of the ward."); *see also Marshall v. Kleinman*, 186 Conn. 67, 438 A.2d 1199 (1982) (placing limits on the rights of conservators to appraise and sell property).

sidered in proper sequence." 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). That sequence requires consideration as a threshold question of whether, viewing the evidence most favorably to the plaintiff, "the officer's conduct violated a constitutional right[.] This must be the initial inquiry." *Id.* at 201, 121 S.Ct. 2151 (citing *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). If a violation is established, "the next, sequential step is to ask whether the right was clearly established." *Id.* Moreover, in setting forth this two-step approach, the Court speaks in mandatory terms—lower courts *must* determine the violation before engaging in a qualified immunity analysis. *See Poe v. Leonard,* 282 F.3d 123, 133 (2d Cir.2002) ("Although *Saucier* did not change the analysis a court applies in examining a qualified immunity defense, it changed the procedure a court should follow.").

Before *Saucier,* the high court's rule appeared to be more flexible. Thus, in *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the Court offered the same prescription—first decide whether plaintiff had articulated a constitutional violation and then examine whether the right at issue was clearly established. But the *Sacramento* Court described this sequence of determinations only as "normally" the "better approach." 523 U.S. at 841 n. 5, 118 S.Ct. 1708.[9]

The central rationale for prescribing a two-step inquiry, however, remained constant from *Sacramento* to *Saucier:* if courts consistently avoided the constitutional issue by simply dismissing suits on the basis of immunity, "standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals." *Id.* Put another way, *Sacramento* and *Saucier's* function "is to place government officials on notice that they ignore such 'probable' rights at their peril." *Wilkinson v. Russell,* 182 F.3d 89, 112 (1999) (Calabresi, J., concurring). *See also id.* ("As the High Court has told us, the thrust of *Sacramento* is to keep the existence of qualified immunity from preventing the clarification of constitutional rights.").

### 2. The Second Circuit's concerns

In interpreting *Sacramento* (prior to the holding in *Saucier* ), this court noted in *Horne v. Coughlin III* that "the Supreme Court carefully avoided saying that the [two-stage] procedure should always be followed." 191 F.3d 244, 248 (2d Cir.1999). "The Court's assertion that consideration of the constitutional question is '[n]ormally' the 'better approach' implies that such consideration is not always the 'better approach.'" *Id.* Consequently, the *Horne* court did not reach the issue of whether a violation had occurred on the facts alleged by the plaintiff, instead dismissing the case on immunity grounds because the right invoked was not clearly established.[10] In so doing, it devoted substantial attention both to the benefits attendant to the two-

**9.** *See also Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (applying *Sacramento* in context of a claim that police violated Fourth Amendment by inviting press to accompany police in execution of a search warrant); *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (applying *Sacramento* in context of a claim that prosecutors violated attorney and client's constitutional rights by executing a

search warrant while client testified before the grand jury).

**10.** Judge Cardamone dissented from the decision in *Horne,* but nonetheless noted that *Sacramento* leaves lower courts "free [to rely solely on qualified immunity] where they can articulate a persuasive reason for doing so." *Horne,* 191 F.3d at 251–52 (Cardamone, J., dissenting).

stage analysis and to the principles relevant to occasional departure from that analysis.

Although *Saucier* rejected the notion that the two-step inquiry is favored but not obligatory, most of the principles outlined in *Horne* remain relevant today. We note three in particular. These principles cannot, of course, make discretionary what the Supreme Court has deemed mandatory. They do, however, affect the choice *in those cases in which the underlying rationale in* Saucier *does not apply.*

First, *Horne* made explicit what earlier cases had only implied: when a constitutional violation is particularly egregious, but the right at issue remains ill-defined, "the public interest in clarifying the law is much greater than in cases" where the violation is less serious. *Horne,* 191 F.3d at 249. *See also Tellier v. Fields,* 280 F.3d 69, 79 (2d Cir.2000) (finding an asserted constitutional violation sufficiently egregious to *require* the *Sacramento* sequence, even before *Saucier* ).

Second, *Horne* observed that the Supreme Court has "for generations warned against reaching out to adjudicate constitutional matters unnecessarily." *Horne,* 191 F.3d at 246 (citing, inter alia, *Ashwander v. TVA,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)). *Horne* concluded therefrom that, where assessing a potential constitutional violation is a particularly difficult exercise, moving directly to the second stage of the inquiry is more likely to be warranted. *See id.* at 249 (weighing the "ease of decision").

Third, *Horne* noted that, where there is qualified immunity, "a court's assertion that a constitutional right exists would be pure dictum" because the assertion "would play no role in supporting the action taken by the court—the dismissal of the case by reason of qualified immunity." *Horne,* 191 F.3d at 247 (citing approvingly to a similar observation in *Wilkinson v. Russell,* 182 F.3d at 112 (Calabresi, J., concurring)). Delimiting the scope and nature of constitutional rights in dicta entails obvious concerns. A court that knows that it will rule against the plaintiff at the second stage of the inquiry may fail to be as careful in its analysis of the first question as it would if the answer to that question was determinative. By the same token, defendants who are confident of prevailing on the "clearly-established" prong will not always present the court with the most sophisticated or carefully reasoned explanations of why they believe the claim to be unwarranted on its merits. *See Horne,* 191 F.3d at 247. To the extent, then, that the avoidance of constitutional dicta is itself desirable, going directly to the second stage of the qualified immunity analysis has distinct advantages.[11]

### 3. The inquiry after Saucier

In *Saucier,* the Supreme Court made plain that a sequential two-step analysis of

---

**11.** Some of the problems that stem from the fact that the *Saucier* sequence requires the lower courts to rule on the validity of rights, in the first instance, in dicta, can be mitigated in part by a firm recognition that the lower court's statement is *only dicta.* Thus, while the Supreme Court, by the very logic of *Saucier,* makes clear that such dicta is enough to put defendant state actors on notice that, if they repeat their acts, they will not have the benefit of qualified immunity, *Saucier* in no way requires lower federal courts to give full *stare decisis* effect to their previous dicta with respect to the merits at play. It follows that, if the circumstances repeat themselves, a case will arise in which qualified immunity is no longer available to the defendants, and the existence of the right, *vel non,* will therefore be determinative. The court facing that situation will undoubtedly give respectful attention to the *Saucier*-mandated clear dicta expressed in the earlier case. But, precisely because the earlier case expounded dicta, the second court will *not* be strictly bound to follow the prior court. It is only in the second case,

qualified immunity claims is not simply recommended but required. We are, of course, bound to implement that decision, and fully expect to do so in the vast majority of qualified immunity cases that come before us. *See, e.g., Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206 (2d Cir.2003) (following *Saucier* sequence); *Loria v. Gorman,* 306 F.3d 1271 (2d Cir. 2002) (same); *Poe v. Leonard,* 282 F.3d 123 (2d Cir.2002) (same). But this does not mean that *Horne's* principles are no longer relevant to qualified immunity analysis, in those situations in which one can conclude that the Supreme Court did not intend to make the *Saucier* sequence mandatory. Since *Saucier,* we have confronted at least one case where circumstances made it inappropriate to apply sequential analysis because *Saucier's* underlying rationale did not apply. *See Koch v. Town of Brattleboro,* 287 F.3d 162 (2d Cir.2003) (since the disputed constitutional right could be litigated in related criminal proceeding, there was no need to settle the issue in the pending litigation). In *Koch,* we specifically relied on *Horne* to support our conclusion that, in appropriate, discrete cases, we may move directly to the second step of the *Saucier* test and refrain

from determining whether a constitutional right has been violated. *Id.* at 166.[12]

Significantly, the situation in *Koch* is not the only one in which circumstances unforeseen in *Saucier* made application of sequential analysis to qualified immunity claims either impractical or impossible. *See, e.g., Santana v. Calderon,* 342 F.3d 18, 29–30 (1st Cir.2003) ("The property right at the core of the federal constitutional allegation is dependent on an unresolved issue of Commonwealth constitutional law that can only be resolved definitively by the Puerto Rico Supreme Court. Thus, the sequential rule of Saucier may not contemplate a situation such as this."); *Dirrane v. Brookline Police Dep't,* 315 F.3d 65, 69–70 (1st Cir.2002) (the two-step inquiry is "an uncomfortable exercise where, as here, the answer whether there was a violation may depend on a kaleidoscope of facts not yet fully developed. It may be that Saucier was not strictly intended to cover the latter case."). In the instant appeal, we are presented with precisely one of these unusual circumstances.

### 4. *A state law exception to* Saucier

■ Moving directly to the immunity question will frequently be appropriate

---

where the issue is determinative, and where, as a result, parties have every interest in arguing their view fully, that the law of the circuit on the existence of the right will finally be settled. In other words, the *Saucier*-mandated sequence tells the state actors that qualified immunity is no longer available for the acts in question, but, by its very nature as dicta, it does not affirmatively establish the right at stake. A second decision is needed to do so.

**12.** Some cases, e.g. *Koch* and *Kruelski v. Conn. Sup.Ct.,* 316 F.3d 103 (2d Cir.2003) (written by the author of this opinion), use the word "discretion" in describing our duty to follow *Saucier's* sequence. *See Koch,* 287 F.3d at 166; *Kruelski,* 316 F.3d at 107. The word, however, is there used in a loose sense.

Lower courts do not have discretion, in the normal meaning of the term, to ignore a Supreme Court requirement where that requirement applies. Instead, in the two aforementioned cases, the term "discretion" suggests only that the Supreme Court did not intend the *Saucier* sequence to apply in every instance, and that lower courts may, and indeed must, while following *Saucier,* also use their good sense and limit it to those cases where it was meant to apply. This is, in fact, the way the court applied discretion in *Koch* and *Kruelski.* The proper approach was aptly described in *Holcomb v. Lykens,* 337 F.3d 217, 220–21 (2d Cir.2003) ("Ordinarily, consideration of the defense of qualified immunity involves a two-step process.").

when the existence of a constitutional violation depends on the resolution of uncertain state law. That is the case here. Whether or not Ms. Ehrlich's rights were violated depends, substantially, on how Connecticut defines the rights of a conservator vis-à-vis the property of his ward, and this question, as we have seen, is not settled in Connecticut.[13]

When faced with inconclusive state law bearing on the merits, we have three approaches available to us in resolving a Fourth Amendment claim that has previously been unsettled. The first would be to interpret the relevant state statutes and precedents as best we can and, on that basis, follow *Saucier* and make a finding as to whether a violation of the federal right has occurred. Since, however, the state courts would later be completely free to give the relevant law a different reading, our decision would not meaningfully settle the issue of whether a federal right was violated in the circumstances. That being so, it is difficult to see how adherence to the *Saucier* sequence would accomplish the Supreme Court's central objective—to make the law clear for future actors.[14] Indeed, in such cases, adopting our own interpretation of state law would actually *subvert Saucier*, by inducing state actors to rely on our rule when that rule might change altogether upon subsequent review by the relevant state courts. *See Wilkinson*, 182 F.3d at 112 (noting that the primary function of the *Sacramento* line of cases is to signal to government officials the line between proper and improper conduct). *See also Mollica v. Volker*, 229 F.3d 366, 371 (2d Cir.2000) ("[I]n some circumstances it would be highly desirable for a court to reach the constitutional question, in others, it could be quite harmful.").

---

**13.** In this case, additional factors counsel departure from the *Saucier* sequence if departure is permitted. First, the facts pertaining to the officers' entry are far from clear. The plaintiff herself is uncertain about what actually unfolded as they were banging on her door—she stated in her trial testimony that she was very upset and could not recall certain details. Moreover, Ms. Ehrlich is a *pro se* plaintiff. Although she had the benefit of counsel at oral argument, she was responsible for the contents of her briefs. Under the circumstances, a determination of the existence of the underlying right is particularly perilous. While these factors do not, in themselves, justify an exception, they do militate in favor of using our "discretion" to move directly to the second state of the inquiry if the *Saucier* requirement does not apply.

**14.** There is no reason to think that the Supreme Court in *Saucier* intended for constitutional rights that affect the behavior of state actors to be authoritatively defined when such a definition itself depends on a federal court's uncertain assumptions about state law. Moreover, state courts confronting previous holdings on state law by federal courts owe no deference to those prior federal court decisions. The issue is one of state law, and the state courts are entirely free to decide the question in the way they think the relevant state statutes and precedents require, regardless of the views of the federal courts. This is very different from the situation that occurs when a second panel faces a determination by a prior panel which, following the *Saucier*-mandated sequence, stated that a federal right existed. While the second panel is not strictly bound by the conclusion of the first panel, because the first panel's statement was technically dicta (see footnote 11), the second panel nevertheless owes considerable deference to the initial, careful assessment of the scope of the right. One can thus understand the Supreme Court's clear implication that a decision of a federal court with respect to *federal* law through the *Saucier* sequence puts state actors on notice and deprives them of qualified immunity if they repeat their actions. But it is far less likely that an analogous federal court decision which relies on its own, non-determinative view of state law can create the certainty needed to deprive state actors of qualified immunity should they repeat their deeds. For these reasons, the objective of *Saucier* is almost certainly negated in cases where federal interpretation of unclear state law is involved.

To avoid this unfortunate result, we might attempt a second option: we could certify a question of state law (here on the legal rights of conservators) to the relevant state Supreme Court in the hopes of getting its authoritative interpretation of the state law. Usually, however, state rules of appellate procedure discourage—and probably preclude—certification in cases where the answer to the certified question is not necessary to the outcome.[15] Since, by hypothesis, the underlying right has never been firmly established, qualified immunity will almost certainly apply and govern the case. It follows that an answer to the certified question would not be determinative. The very same thing that makes the initial step in the *Saucier* sequence only dicta is extremely likely to make it non-determinative as far as state certification laws are concerned.[16] As a result, certification of the question to the state's high court is unlikely to be fruitful—or indeed available. *Cf. Santana v. Calderon,* 342 F.3d at 30 (noting that "under other circumstances, we might choose to certify this issue to the Puerto Rico

Supreme Court," but concluding that certification did not make sense in the qualified immunity context); *Hudson v. Hall,* 231 F.3d 1289, 1295 n. 5 (11th Cir.2000) (moving directly to the second stage of the inquiry, in a pre-*Saucier* case, where the question of "whether probable cause existed—and, whether the Fourth Amendment was violated—turns upon a difficult question of state law").

We are therefore left only with a third possibility: to deviate from the *Saucier* sequence. Moreover, in the circumstances, such a deviation is fully in keeping with the spirit and purpose of *Saucier*—to settle constitutional rights that might otherwise remain uncertain. That aim was the basis of the exceptions to *Saucier*'s sequence articulated in *Koch* and *Horne,* where the court relied on the fact that the issue in question would frequently come up for review in more appropriate contexts. The immediate reason for the exception to *Saucier* that we consider today is different. It is quite possible that the particular question might not arise in the foreseeable future (indeed the question in the instant

---

15. Connecticut's certification statute, adopting wholesale the 1995 Uniform Certification of Questions of Law Act, states that the high court may, in its discretion, answer questions if they "may be determinative of an issue in pending litigation." Conn. Gen.Stat. § 51–199b. However, the Connecticut rules of appellate procedure appear to limit certification to cases in which the answer "may be determinative of the *cause* then pending in the certifying court." Conn.App. Proc. § 82–1 (emphasis added; tracking language from an older version of Connecticut's statute, which governed before adoption of the Uniform Act). *See also* Conn.App. Proc. § 82–3 (requiring that the "questions presented should be such as will be determinative of the case, and it must appear that their present determination would be in the interest of simplicity, directness and economy of judicial action"); *Ramos v. Town of Vernon,* 254 Conn. 799, 802 n. 1, 803, 761 A.2d 705 (2000) (citing Rules 82–1 and 82–3 in certification context). Vermont's

certification rules look much the same. V.R.A.P. 14(a) states that the high court can answer a certified question if "the answer may be determinative of an issue in pending litigation. . . ." But the Reporter's Notes to Rule 14 suggest a more restrictive scope: "[T]he answer must be determinative of pending litigation"; and the Rule "is not an undertaking to render advisory opinions." To date, as far as we have been able to find, neither the Connecticut nor the Vermont Supreme Court has answered a certified question that did not prove cause-determinative. *See also* 22 N.Y.C.R.R. § 500.17 (permitting certification only of "determinative questions of New York law . . . involved in a cause pending before" a federal court).

16. *Saucier,* of course, in no way suggests that its sequence is constitutionally mandated and is meant to override state certification laws intended to exclude resolution of advisory questions through certification of dicta.

case has not arisen to date). Nevertheless, we believe we are more faithful to the underlying aim of *Saucier* by declining to make a constitutional determination at the first stage of the inquiry—where that determination, based on an interpretation of ambiguous state law, is provisional only and subject to reversal as a result of subsequent state court rulings—than by following the *Saucier* sequence. Accordingly, this is the course we have chosen to take here.

### 5. The instant appeal

■ To decide whether Officer White and Sergeant Kenny retain qualified immunity, we must assess whether their actions "violate clearly-established rights of which an objectively reasonable official would have known." *Thomas*, 165 F.3d at 142. If the officers reasonably believed that the entry did not violate the plaintiff's rights, they are "entitled to qualified immunity even if that belief was mistaken." *Loria v. Gorman*, 306 F.3d 1271, 1282 (2002). If their belief was unreasonable, however, qualified immunity "offers [them] no solace." *Id.* (citing *Harlow*, 457 U.S. at 818–19, 102 S.Ct. 2727).

Plaintiff asserts that the officers' actions were unreasonable, and her rights clearly established, under *both* prongs of the *Davis* test. First, she argues that an objectively reasonable official would have known that the access requirement in *Davis* proscribed any "forced entry into an occupied dwelling absent an emergency."

Second, she contends that the officers were unreasonable in their stated belief that Connecticut law empowered conservators to consent to entry and search of a home occupied by a third party. As a result, she posits, she had a clearly established right to be free from this type of search. We find her arguments unavailing as to both prongs.

First, the Supreme Court has never identified "access" as a prerequisite to a valid consent to search. This prong of the *Davis* test represents a Second Circuit elaboration on high court doctrine.[17] To date, we have not been called upon to map the precise contours of "access." Certainly, we have never adopted as the clear law of this circuit plaintiff's strict view that access must mean *physical* access and not legal access.

Since the issue before us is the existence of qualified immunity, we need not delimit the specific boundaries of the access requirement. We need only determine whether Ms. Ehrlich's asserted right to be free from the sort of *forced* entry alleged in this case was clearly established at the time of the incident. *See Creighton*, 483 U.S. at 640, 107 S.Ct. 3034 ("[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). We hold that it was not clearly established.

Plaintiff's alternative argument—that a reasonable officer would have known that Mr. Roberto had no right to authorize the

---

**17.** In *United States v. Matlock*, the Supreme Court established a third party consent rule that did not differentiate between access and authority: "[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from *a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspect-* ed." 415 U.S. 164, 170–71, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (emphasis added). The access distinction first appeared in *United States v. Gradowski*, which interpreted *Matlock* and held that "[c]onsent to a search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." 502 F.2d 563, 564 (2d Cir.1974) (per curiam).

entry, forcible or otherwise, as required under the second *Davis* prong—fails as well. She relies on Connecticut landlord-tenant law in asserting that she was a "tenant in possession" and therefore her consent was necessary before the conservator could lawfully enter the home. *See* Conn. Gen.Stat. § 47a–16(d) (requiring a tenant to consent, under most circumstances, before a landlord enters a dwelling). The conservator, in her view, is more like a landlord than a co-tenant in possession. In order to enter the home without her consent, according to plaintiff, the conservator must either procure a warrant or evict her pursuant to Conn. Gen. Stat. § 47a–23. *See also* Conn. Gen.Stat. §§ 45a–644, 655 & 656 (detailing rights and duties of conservators). And, she further argues, because a landlord does not have authority to give consent to a police search of a tenant's home, a reasonable police officer would have understood that the conservator did not have appropriate "common authority" over, or "permission to gain access" to, the property.[18]

Plaintiff's argument fails utterly to identify a *clearly-established* right to be free from a warrantless search of her home authorized by the conservator of her father's estate.[19] The landlord-tenant analogy is inapposite, as neither her father (Mr. Ehrlich) nor Mr. Roberto operated as Ms. Ehrlich's landlord, or anything like it. Mr. Ehrlich had been a *co-habitant* in the home until three weeks prior to the inci-

dent, and retained ownership of the premises. *See Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. 988 (holding that common authority "rests ... on mutual use of the property by persons generally having joint access or control for most purposes"). State conservatorship law, moreover, does not in any way clearly negate Mr. Roberto's right, as conservator for Mr. Ehrlich, to permit others to enter the property, and to do so even though Ms. Ehrlich was living there. Indeed, if anything, earlier Connecticut cases, like *Zanoni* and *Hyde,* lean the other way.

Under the circumstances, Officer White and Sergeant Kenny could have reasonably believed that their warrantless entry was lawful, given Mr. Roberto's letter granting permission to use force to "enter upon the premises at 202 Wickham Road for the purpose of removing any and all personal belongings" of Mr. Ehrlich. *See Creighton,* 483 U.S. at 641, 107 S.Ct. 3034 ("The relevant question ... is the objective (albeit fact-specific) question whether a reasonable officer could have believed the warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed.").

*Conclusion*

Because Ms. Ehrlich has not proffered evidence demonstrating the violation of a "clearly-established right[ ] of which an ob-

18. In the alternative, Ehrlich asserts that even if the entry was legal, "the Defendants acted unreasonably in performing and/or assisting others to perform, under the color of law, an unauthorized 'no-knock' entry in the absence of a true emergency." *See Richards v. Wisconsin,* 520 U.S. 385, 387, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997) ("[T]he Fourth Amendment incorporates the common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry."). In her trial testi-

mony, plaintiff admitted that the defendants knocked on her door for a considerable period of time before entering the house, and told her that they wished to enter. She further admitted that she knew they were police officers. This particular line of argument, therefore, is meritless.

19. Benjamin Ehrlich had resided at the home until his removal three weeks previously by the Department of Social Services.

jectively reasonable official would have known," the defendants are entitled to qualified immunity, and judgment as a matter of law on the Fourth Amendment claim was proper.

The district court having correctly ruled against the plaintiff as a matter of law, on the merits, on all her other claims, we AFFIRM its judgment.