06-3623-cv
Moore v. Andreno

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2006

(Argued: February 7, 2007      Decided: October 22, 2007)

Docket Nos. 06-3623-cv(L), 06-3748(XAP)

------------------------------------------------------x

RICHARD B. MOORE,

      Plaintiff-Appellee-Cross-Appellant,

-- v. --

JOSEPH A. ANDRENO, DELAWARE COUNTY DEPUTY SHERIFF AND KURT R. PALMER, DELAWARE COUNTY DEPUTY SHERIFF,

      Defendants-Cross-Claimants-Appellants-Cross-Appellees,

COUNTY OF DELAWARE AND THOMAS MILLS, DELAWARE COUNTY SHERIFF,

      Defendants-Cross-Claimants,

RUTH M. SINES,

      Defendant-Cross-Defendant.

------------------------------------------------------x

B e f o r e : WALKER and SACK, Circuit Judges, and DANIELS, District Judge.[*]

    Appeal by Defendants Andreno and Palmer from a judgment of the United States District Court for the Northern District of New York (Thomas J. McAvoy, Judge) denying their motion for summary judgment. Because the law governing third-party consent searches

---

[*] The Honorable George B. Daniels, of the United States District Court for the Southern District of New York, sitting by designation.

is unsettled, and because defendants made a reasonable mistake in applying that law to the situation with which they were confronted, we hold that defendants are entitled to qualified immunity and the district court erred in denying them summary judgment.

REVERSED and REMANDED.

FRANK W. MILLER, East Syracuse, N.Y., for Defendants-Cross-Claimants-Appellants-Cross-Appellees.

TERRENCE P. O'LEARY, Walton, N.Y., for Plaintiff-Appellee-Cross-Appellant.

JOHN M. WALKER, JR., Circuit Judge:

Courts have long acknowledged that a person has the right to establish a private sanctum in a shared home, a place to which he alone may admit or refuse to admit visitors.  Yet, with the recurrence of domestic violence in our society, we are loath to assume that a man may readily threaten his girlfriend, take her belongings, lock her out of part of his house, and then invoke the Fourth Amendment to shield his actions.  Deputies Joseph A. Andreno and Kurt R. Palmer, responding to an emergency call, were faced with reconciling these two competing interests.  While they misapplied the relevant constitutional calculus, they are police officers, not lawyers or mathematicians.  And thus, because the law governing the authority of a third party to consent to the search of an area under the predominant control of another is

-2-

unsettled, and because Deputies Andreno and Palmer made a reasonable mistake in applying that law to the situation with which they were confronted, the district court erred in denying them summary judgment on qualified immunity grounds.

## BACKGROUND

Richard B. Moore and Ruth M. Sines were on-again, off-again lovers.[1] They lived together in Moore's home for a period of time in 1996-1997 and again in 2001-2002. Sines had a key to Moore's home; her furniture was there and she paid some of the bills. However, Sines was subject to certain restrictions: her children lived with their fathers and Moore's study was "off limits" to her, and it was undisputed that Moore, as she put it, "always kept it locked."

On or about April 9, 2002, while traveling to New York from Tennessee, Moore and Sines had an argument, and Moore threatened to kill Sines. Shortly after their return two days later to Moore's home in Delaware County, New York, Sines decided to move out and had begun to pack her belongings when she discovered that her helmet and snorkeling equipment were missing. Sines "went upstairs to see what had been going on upstairs in the last two days," suspecting that Moore had moved her effects. Upstairs,

---

[1] Like the district court, we rely on the facts set forth in defendants' statement of material facts in light of the plaintiff's failure to respond timely to the defendants' summary judgment motion.

she noticed two new locks on the door to Moore's study. Thinking that her missing equipment might be in Moore's study, Sines cut the locks with a bolt cutter.

Sometime thereafter, Sines received a telephone call from an unidentified caller. Fearing that it might be Moore and that he could be en route to his home and bent on violence, Sines called the Delaware County Sheriff's Department. The Sheriff's Department dispatched Deputies Andreno and Palmer to the scene.

Upon their arrival, a "hysterical" Sines requested the Deputies' assistance in retrieving her belongings from Moore's study.[2] She explained that she feared that Moore might return at any moment. She also informed the Deputies that she "wasn't allowed in th[e] [study] unless [Moore] was there" and that she had cut the locks off the door. She may also have informed them that the Deputies were likely to find marijuana in the study.

In the company of the Deputies, Sines entered the study and searched it, including by opening a desk drawer and rummaging in a closet. In both places, Sines discovered drugs and drug paraphernalia.[3] The Deputies then seized the drugs.

_____

[2] It is not clear from the record whether Sines entered Moore's study prior to the arrival of the Deputies in order to verify whether or not her helmet and snorkeling equipment were, in fact, in that room -- and if not, why not. She presumably had an opportunity to do so, as she cut the bolts prior to calling the Sheriff's Department.

[3] Sines found a medical bag or briefcase in the closet. Only after opening it -- perhaps thinking her snorkeling equipment

-4-

On May 8, 2003, a state grand jury indicted Moore on two counts of criminal possession of a controlled substance in the fourth degree and one count of criminal possession of a controlled substance in the fifth degree. On February 9, 2004, the county court, after suppressing the evidence taken from the scene, dismissed the indictment.

Moore then filed suit in the United States District Court for the Northern District of New York against, principally,[4] Deputies Andreno and Palmer, asserting claims under 42 U.S.C. §§ 1981, 1983, 1985, and state law. The gravamen of his complaint is that the Deputies' entry into his study and seizure of his drugs violated the Fourth Amendment to the United States Constitution. Moore does not dispute the legality of the Deputies' entry into his home; he contests only the narrower, and more nettlesome, question of their entry into and search of his study. Cf. United States v. Karo, 468 U.S. 705, 726 (1984) (O'Connor, J., concurring).

Defendants Andreno and Palmer moved for summary judgment, arguing in the alternative that their search of the study was not unconstitutional or, if it was, that they were nevertheless

---

might be in the medical bag -- did she discover the drugs.

[4] Moore also named as defendants the County of Delaware, its Sheriff Thomas Mills, and Ruth Sines. The district court dismissed his claims against those defendants, and he has not appealed.

entitled to qualified immunity.

The district court (Thomas J. McAvoy, Judge) first considered whether Moore had properly alleged a constitutional violation. The district court inquired whether Sines had actual or apparent authority to consent to a search of the study, or whether other exigent circumstances justified the search. The district court noted that "[a] third party may validly grant the requisite consent if she has joint access or control of the property for most purposes," Moore v. Andreno, No. 3:05-cv-0175, 2006 WL 2008712, at *3 (N.D.N.Y. July 17, 2006), and acknowledged that generally when "co-occupants are residing together not as mere roommates, but as part of an intimate relationship, social expectations are that the co-occupants of the home enjoy full access to the entire home," id. at *6. The district court nevertheless concluded that "a fair-minded trier of fact could reasonably conclude that [Moore] maintained exclusive control over the study and that Sines did not have actual, apparent, or implied authority to consent to entry into that room." Id. at *7. The district court likewise held that exigent circumstances could not justify the Deputies' entry into the study. Although Sines had complained to the Sheriff's Department of possible domestic violence, her allegations, the district court explained, were stale: they "pertained to conduct that occurred several days earlier. . . . There was nothing urgent or imminent." Id. at

-6-

*10.  The district court therefore held that Moore had "established a colorable claim of a constitutional violation."  Id. at *7.

The district court next considered whether the Deputies were entitled to qualified immunity, and denied it.  The district court held that "[i]t was clearly established at all times relevant hereto that third-party consent is valid" only under certain, well-defined circumstances.  Id. at *8.  Without extended discussion, the district court also held that no reasonable officer could have believed that exigent circumstances justified the search.  Id. at *11.  The Deputies appealed.

**DISCUSSION**

The Deputies argue that the district court misapplied the law governing third-party consent searches and searches predicated upon exigent circumstances.  First, the Deputies contend that the "lower court erred when it concluded that the Deputies could not reasonably have believed that Sines had the authority to enter into [Moore's] study."  Appellants' Br. at 20.  Second, they liken their behavior to that of the officers in United States v. Miller, 430 F.3d 93 (2d Cir. 2005), who believed that the area they searched harbored an individual posing a danger to others on the scene; on the basis of this comparison, they urge us to reverse the district court's conclusion that exigent circumstances did not justify the search of Moore's

-7-

study.

The Deputies also argue that the district court improperly denied them qualified immunity. Whether or not the search of Moore's study was unconstitutional, they say, it was not so egregious a constitutional violation that reasonable minds could not differ as to its putative legality, especially in light of the confusion in the law surrounding the scope of co-occupants' authority to consent to searches of shared premises.

As a general rule, the denial of summary judgment is not immediately appealable. See 28 U.S.C. § 1291. "Under the collateral order doctrine, however, [we will review] the denial of a qualified-immunity-based motion for summary judgment . . . to the extent that the district court has denied the motion as a matter of law." O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 38 (2d Cir. 2003). Unlike in most such appeals, however, the plaintiff here has not filed a statement of material facts, and so, like the district court, we are unable to accept his facts for purposes of deciding whether the Deputies may properly invoke qualified immunity. Cf. Salim v. Proulx, 93 F.3d 86, 91 (2d Cir. 1996) (permitting immediate appeal when defendants accepted plaintiff's version of the facts).

Nevertheless, our appellate jurisdiction over this case is not in doubt. The district court's holding that the law governing third-party consent searches was clearly established is

a conclusion of law and is thus immediately appealable. <u>See</u> <u>Proulx</u>, 93 F.3d at 89 (noting that the collateral order rule is "easy to apply" when a defendant challenges a denial of qualified immunity on the argument "that the district court erred in ruling that the law the defendant is alleged to have violated was clearly established"). Moreover, while we think it a closer question, the district court's conclusion that "it cannot be said that the Deputies acted reasonably under the circumstances" is also immediately appealable. <u>Moore</u>, 2006 WL 2008712, at *9. The district court's determination on that score did not require resolution of disputed facts; rather, the district court came to its decision on the basis of the uncontroverted, albeit one-sided, record before it. In light of the plaintiff's counsel's failure to oppose the defendants' motion, the only version of facts that the court had before it -- and therefore the undisputed version of the facts -- was that proffered by the defendants.

And so, we now turn to the inquiry into the merits of a qualified immunity defense:

> The first step in a qualified immunity inquiry is to determine whether the alleged facts demonstrate that a defendant violated a constitutional right. If the allegations show that a defendant violated a constitutional right, the next step is to determine whether that right was clearly established at the time of the challenged action -- that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." A defendant will be entitled to qualified immunity if either (1) his actions did not violate clearly

established law or (2) it was objectively reasonable for him to believe that his actions did not violate clearly established law.

Iqbal v. Hasty, 490 F.3d 143, 152 (2d Cir. 2007) (citations omitted) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).[5] We address these steps in order, beginning with the question of whether the Deputies' conduct, as alleged, violated a constitutional right.  We review the district court's conclusions de novo.  Savino v. City of New York, 331 F.3d 63, 71 (2d Cir. 2003).

**I. The Constitutional Violation**

**A. Third-Party Consent**

The Fourth Amendment forbids "unreasonable" searches and seizures.  This constitutional bulwark against government intrusion into the lives of private citizens is made up of an interlacing web of standards and rules.  For instance, "[w]e must balance the nature and quality of the intrusion on the individual's . . . interests against the importance of the governmental interests alleged to justify the intrusion," United States v. Place, 462 U.S. 696, 703 (1983), under the "totality of

---

[5]    Despite continued criticism of this "rigid order of battle," see Scott v. Harris, 127 S. Ct. 1769, 1774 n.4 (2007) (internal quotation marks omitted), unless and until the Supreme Court heeds the plea to overrule Saucier, we will continue to ask first whether a constitutional violation has occurred and only then ask whether defendants are nevertheless entitled to qualified immunity.  Cf. Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249, 1275 (2006).

the circumstances," United States v. Knights, 534 U.S. 112, 118 (2001) (internal quotation marks omitted).  Yet the Supreme Court has also admonished that a warrantless search is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (omission in original) (internal quotation marks omitted).

In United States v. Matlock, the Supreme Court explicated one such "well-delineated" exception: that pertaining to "search[es] of property, without warrant and without probable cause, but with proper consent voluntarily given."  415 U.S. 164, 165-66 (1974).  Such consent may be given by a third party.  As the Court has explained,

> the authority which justifies the third-party consent . . . [rests on] mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right . . . .

Id. at 171 n.7.

We have refined the Matlock rule, holding that a third party has authority to consent to a search of a home when that person (1) has access to the area searched and (2) has either (a) common authority over the area, (b) a substantial interest in the area, or (c) permission to gain access to the area.  United States v. Davis, 967 F.2d 84, 87 (2d Cir. 1992); see also United States v.

-11-

_Gradowski_, 502 F.2d 563, 564 (2d Cir. 1974) (per curiam).[6]

Despite the stringency of these rules concerning third-party consent searches, we also ask whether a police officer's objectively reasonable belief that he has obtained consent, even if in fact he has not, renders a search constitutional. See _Illinois v. Rodriguez_, 497 U.S. 177, 188 (1990) (holding a search constitutional when "the facts available to the officer[s] . . . [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises" (internal quotation marks omitted)); see also _Florida v. Jimeno_, 500 U.S. 248, 249 (1991). That is, even if a third party lacks actual authority to consent to a search of a particular area, he still may have apparent authority to consent to the search. See, e.g., _United States v. Buckner_, 473 F.3d 551, 555 (4th Cir. 2007). However, "the _Rodriguez_ apparent authority rule applies [only] to

_____

[6] Another refinement of _Matlock_ is found in _United States v. Groves_. See 470 F.3d 311, 319 (7th Cir. 2006) (noting that factors indicative of third party's authority include "(1) possession of a key to the premises; (2) a person's admission that she lives at the residence in question; (3) possession of a driver's license listing the residence as the driver's legal address; (4) receiving mail and bills at that residence; (5) keeping clothing at the residence; (6) having one's children reside at that address; (7) keeping personal belongings such as a diary or a pet at that residence; (8) performing household chores at that residence; (9) being on the lease for the premises and/or paying rent; and (10) being allowed into the residence when the owner is not present" (citations omitted)); see also 4 Wayne R. LaFave, _Search and Seizure: A Treatise on the Fourth Amendment_ § 8.3(a), at 148 n.22 (4th ed. 2004) ("The _Matlock_ formulation is not a model of clarity.").

-12-

mistakes of fact [and] not mistakes of law."  4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.3(g), at 175 (4th ed. 2004); see, e.g., United States v. Brown, 961 F.2d 1039, 1041 (2d Cir. 1992) (per curiam) ("Rodriguez would not validate, however, a search premised upon an erroneous view of the law.  For example, an investigator's erroneous belief that landladies are generally authorized to consent to a search of a tenant's premises could not provide the authorization necessary for a warrantless search." (citation omitted)); see also Koch v. Town of Brattleboro, 287 F.3d 162, 167 & nn.3-4 (2d Cir. 2002).

Such, then, was the state of the law when Deputies Andreno and Palmer accompanied Sines into Moore's study, permitted her to forage in his desk and closet for her belongings, and discovered the drugs.  Four years later, however, the Supreme Court decided Georgia v. Randolph, 547 U.S. 103 (2006).  In Randolph, the Court held that a search conducted on the basis of one co-tenant's consent is unreasonable as to a physically present and objecting co-tenant.  Id. at 120.  In doing so, however, Randolph emphasized that the reasonableness of a consent search is informed by "widely shared social expectations."  Id. at 111.  For example, "[a] person on the scene who identifies himself, say, as a landlord or a hotel manager calls up no customary understanding of authority to admit guests without the consent of the current occupant."  Id. at 112; see also id. at 111 ("When someone comes

-13-

to the door of a domestic dwelling with a baby at her hip, . . . she shows that she belongs there, and that fact standing alone is enough to tell a law enforcement officer or any other visitor that if she occupies the place along with others, she probably lives there subject to the assumption tenants usually make about their common authority when they share quarters."). The Court thus subtly elided the existing distinction between a third party's actual authority to consent (i.e., Matlock) and his apparent authority to consent (i.e., Rodriguez). Cf. id. at 112 (noting an instance "in which even a person clearly belonging on premises as an occupant may lack any perceived authority to consent" (emphasis added)).

While the ramifications of Randolph for the Davis rule are not clear, we need not strive to discern them. Under either Davis or Randolph, we see no basis to disturb the district court's conclusion that Sines lacked sufficient actual authority to consent to the Deputies' search of Moore's study. First, under Davis, the law in effect at the time of the search, Sines lacked actual authority to consent to the search of Moore's study because, though she had obtained physical access to the room by the time the Deputies arrived, she did not have control over the premises. Davis reads Matlock to require that one who asserts that a third party has authority to consent to a search of an area satisfy a conjunctive test: the third party must have both

-14-

access to and some measure of control (or right to exert control) over the area. See Davis, 967 F.2d at 86-87; cf. United States v. Whitfield, 939 F.2d 1071, 1074-75 (D.C. Cir. 1991) (interpreting Matlock as asking whether a third party has access to and makes "mutual use" of an area). But see United States v. Rith, 164 F.3d 1323, 1329 (10th Cir. 1999) ("[T]he . . . test is disjunctive: a third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it.").

As a preliminary matter, "we note that no case in this circuit has delimited the requisite 'access' necessary to satisfy the first prong of the Davis test." Ehrlich v. Town of Glastonbury, 348 F.3d 48, 53 (2d Cir. 2003). In the instant case, it is arguable whether Sines possessed the requisite access to Moore's study. On the one hand, by the time the Deputies arrived, she had already cut the locks on the study door and therefore had physical access to the room. On the other hand, Sines's access was acquired by force, and we stated in Ehrlich that "we have never adopted as the clear law of this circuit [the] view that access must mean physical access and not legal access." Id. at 60; see also id. at 54 (noting our lack of "clear precedential guidance . . . on . . . whether some amount of physical force is permissible under the access prong of

-15-

Davis"). Thus, while she had physical access to the study, Sines may have lacked "legal access." In other cases, we have found the access requirement to be satisfied when the party who consented to the search had a key to the searched area, see United States v. Buettner-Janusch, 646 F.2d 759, 765 (2d Cir. 1981), or was the owner of the searched container and could "get into [it] whenever he wanted" despite not having the key, see Davis, 967 F.2d at 87 n.3. These were not the circumstances under which Sines acted.

Regardless of whether Sines's forced access to the study was enough to satisfy the first prong of Davis, she lacked authority to consent to the search because she failed to satisfy the second prong: Sines did not have any real measure of control over the study. First, she had no common authority over the area as she and Moore were not married and did not share ownership of the house. See Davis, 967 F.2d at 87 ("Cleare's ownership and actual possession of the trunk in his bedroom, coupled with his ready access to it, indicate that, at the very least, he retained common authority over it."); see also United States v. Backus, 349 F.3d 1298, 1304 (11th Cir. 2003) (holding that an estranged wife who was a domestic violence victim and co-owner of a home could consent to a search even though her husband had changed the locks); United States v. Duran, 957 F.2d 499, 505 (7th Cir. 1992) ("[A] spouse presumptively has authority to consent to a search

-16-

of all areas . . . ."); United States v. Brannan, 898 F.2d 107, 108 (9th Cir. 1990) (affirming a wife's actual authority to consent to a search of her home, despite the fact that her husband had changed the locks, when she had left the home due to fear of her husband); United States v. Long, 524 F.2d 660, 661 (9th Cir. 1975) (same).

Second, Sines did not have a substantial interest in the study, as required by Davis. Her only interest in that room came from her personal belief that some of her belongings were being kept there. Sines's intuition, standing alone, did not give her a "substantial" interest in the study. While no case in this circuit has yet defined what constitutes a "substantial interest" for purposes of the Davis test, the Supreme Court has stated that

> [c]ommon authority is . . . not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Matlock, 415 U.S. at 171 n.7 (citations omitted). It would be inconsistent with these principles to define "substantial interest" in terms of a property interest alone, particularly in a case in which the third party lacked common authority and joint access, and in which the property interest itself was purely

-17-

speculative.[7]

In Davis, the court determined that Cleare, the consenting party, had a substantial interest in the searched container based on the fact that "it was his trunk and he kept personal items of some importance in it."  967 F.2d at 87.  But in addition to Cleare's property interest in the trunk and in the items contained therein -- and consistent with the spirit of Matlock -- the elements of mutual use, joint access, control, and assumption of risk were also present:

> [Cleare] testified that he owned the footlocker, that he could open it at any time he wished "if [he] had to," and that he kept various personal items in it, including photographs of present and former girlfriends.  Cleare also testified that Content never asked him not to look inside the containers that Content had placed in the footlocker, and that "nothing could have stopped" him from inspecting them.  He added that Content never forbade him to show the footlocker or its contents to others.

Id. at 86 (alteration in original) (footnote omitted).  While we do not mean to say that all of these factors must be present for the substantial interest requirement to be met, the fact that none of them was present in this case strongly indicates that Sines did not have a substantial interest in Moore's study.

Finally, Sines did not have permission to gain access to the searched area, as Moore expressly forbade her to enter the study.  See Davis, 967 F.2d at 86 (finding valid consent when the

---

[7] There is no evidence that Sines's personal property was actually being kept in the study; she was unable to find the missing items during her search.

-18-

consenting party was never asked not to look inside the searched containers and never forbidden to show them to others); cf. United States v. Zapata-Tamallo, 833 F.2d 25, 27 (2d Cir. 1987) (per curiam) (concluding that a host may consent to a search of his guest's bag when the guest failed to show that the bag was "'obviously' his"); Buettner-Janusch, 646 F.2d at 765 ("[T]o perform his laboratory duties, Macris was authorized to enter any part of the laboratory and to open any jars of chemicals found there."); United States v. Perez, 948 F. Supp. 1191, 1200-01 (S.D.N.Y. 1996) (noting that the defendant never "prohibited his father from examining the contents of the storage bins kept in the closet and the armoire of [his] bedroom").  Having failed to satisfy both parts of the Davis test, Sines was without authority to consent to a search of the study, and the Deputies therefore cannot rely on consent to argue that the search was reasonable.

Under Randolph, the constitutional calculus of determining whether the search was unreasonable might be somewhat different. See 547 U.S. at 111 ("[T]he reasonableness of a search is in significant part a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests.").  But we see no common understanding of social practices, as Randolph uses that concept, that could have led the officers to believe that Sines, who admitted to the officers that she had broken the locks on Moore's

-19-

study and lacked permission to enter it, had authority to consent to a search of the room.  Cf. id. at 112 ("Matlock relied on what was usual and placed no burden on the police to eliminate the possibility of atypical arrangements, in the absence of reason to doubt that the regular scheme was in place." (emphasis added)).

A study is commonly thought to be a private place. See Lloyd L. Weinreb, Generalities of the Fourth Amendment, 42 U. Chi. L. Rev. 47, 62 (1974) ("[W]ithout special information one [might] suppose that husband and wife have independent authority to admit persons to the living room and the kitchen, and probably to the bathroom and bedroom; neither would have authority to admit persons to the other's study . . . ."). Moore, moreover, locked the door to his study, see United States v. Andrus, 483 F.3d 711, 718 (10th Cir. 2007) ("The inquiry into whether the owner . . . has indicated a subjective expectation of privacy traditionally focuses on whether the subject . . . is physically locked."); United States v. Kinney, 953 F.2d 863, 866 (4th Cir. 1992); United States v. Block, 590 F.2d 535, 537 (4th Cir. 1978),[8] and refused Sines permission to enter, see Rith, 164 F.3d at 1331 (noting that "an agreement or understanding between the defendant and the third party that the latter must have permission to enter

---

[8]    The presence of a lock is not dispositive in all cases.  It is not certain that, had Moore locked his study only after his altercation with Sines, he could have terminated any preexisting authority on her part to consent to its search.  See, e.g., Brannan, 898 F.2d at 108; Long, 524 F.2d at 661.

-20-

the defendant's room" would vitiate consent).

As Chief Justice Roberts has explained, at a bare minimum, "a person [who] wants to ensure that his possessions will be subject to a consent search only due to his own consent, . . . [may] place these items in an area over which others do not share access and control, [like] . . . a private room." Randolph, 547 U.S. at 135 (Roberts, C.J., dissenting) (third emphasis added); United States v. Morning, 64 F.3d 531, 536 (9th Cir. 1995) ("A defendant cannot expect sole exclusionary authority unless he . . . has a special and private space within the joint residence."), abrogated by Randolph, 547 U.S. at 108 n.1; Zapata-Tamallo, 833 F.2d at 27; United States v. Robinson, 479 F.2d 300, 302 (7th Cir. 1973) (upholding consent when "the defendant [did not] claim exclusive dominion and control over a specific room or portion of a room or particular area of the apartment"). That is precisely what Moore did, and his ability to do so is unaffected by his decision otherwise to share his home with another.

With these social expectations operating in the background, and with the specific knowledge that Sines was not permitted to enter the study and had used force to gain access, the Deputies could not validate their warrantless search of Moore's study on the basis of consent.

**B. Exigent Circumstances**

The Deputies also argue that their entry into the study was

-21-

justified because they worried that Moore might arrive and wish to (or already be on the premises prepared to) do violence to Sines.  We need not tarry long on this argument.  The exigency of a situation may insulate a warrantless search from constitutional attack if "law enforcement agents were confronted with an 'urgent need' to render aid or take action."  United States v. McDonald, 916 F.2d 766, 769 (2d Cir. 1990) (en banc) (quoting Dorman v. United States, 435 F.2d 385, 391 (D.C. Cir. 1970) (en banc)).  See generally Brigham City v. Stuart, 126 S. Ct. 1943, 1947 (2006) ("One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury.").  We have explained that the "urgency" of the officers' need depends on six factors:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause . . . to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

McDonald, 916 F.2d at 769-70 (omission in original).

Considering the situation confronted by Deputies Andreno and Palmer in light of these factors (adapted to the circumstances of this case), we do not think that the Deputies had an "urgent need" to enter the study and thus that "exigent circumstances" could justify the search.  The Deputies entered Moore's home

-22-

peacefully and Sines told them that Moore was not there.  Cf. Tierney v. Davidson, 133 F.3d 189, 197 (2d Cir. 1998) ("It was reasonable for Davidson to believe that someone inside had been injured or was in danger, that both antagonists remained in the house, and that this situation satisfied the exigent circumstances exception." (emphasis added)).  The Deputies stayed with Sines for "quite a while" and at no time did they instruct Sines to hurry, nor did they look elsewhere in the home for Moore.

Moreover, if the Deputies had suspected that Moore might be in the house, they would only have been justified in conducting a protective sweep of those spaces "where [he] m[ight] [have] be[en] found."  Maryland v. Buie, 494 U.S. 325, 335 (1990).  There is no suggestion that anyone thought Moore might have concealed himself in the erstwhile locked study.

**C. Conclusion**

For the foregoing reasons, we think that the Deputies' search of Moore's study was unreasonable and violated the Fourth Amendment.  Sines lacked the authority to consent to the Deputies' search -- both because she did not have the requisite access to and control over the study and because the particulars of her relationship with Moore were not such that society would expect her to have common authority over the study.  Moreover, the Deputies had no urgent need to enter the study, as Moore was

not yet on the premises, and there was no indication that his arrival was imminent.

**II. Lack of a Clearly Established Right**

We turn next to the Deputies' argument that, even if they violated Moore's constitutional rights, they are entitled to qualified immunity because the law regarding third-party consent to access in a shared dwelling was not clearly established at the time of the search. If, as here, "a constitutional right would have been violated on the facts alleged," Saucier, 533 U.S. at 200, the next inquiry is "whether the right was clearly established," id. The Supreme Court has clarified that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202; see also Demoret v. Zegarelli, 451 F.3d 140, 148-49 (2d Cir. 2006). Normally, it is only the "plainly incompetent or those who knowingly violate the law" -- those who are not worthy of the mantle of office -- who are precluded from claiming the protection of qualified immunity. Malley v. Briggs, 475 U.S. 335, 341 (1986).

The district court concluded that the law governing consent searches "was clearly established at all times relevant hereto." Moore, 2006 WL 2008712, at *8. It further held that "reasonable officers could only conclude that [neither consent nor] exigent

-24-

circumstances" justified the Deputies' search of Moore's study. Id. at *11. We disagree.

For constitutional suits like this one to deter misconduct, without also deterring citizens from taking jobs in the public sector, police officers must be able to understand the legal constraints on their conduct. See Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 129 (2d Cir. 2004) ("The compromise between remedy and immunity that we have chosen turns critically upon notice."). See generally Hope v. Peltzer, 536 U.S. 730, 739-40 (2002). Thus, it is not enough to say that it was clearly established that a warrantless search of an area is unconstitutional absent probable cause or the voluntary consent of a person with authority to consent to such a search. "To be clearly established, a right must have been recognized in a particularized rather than a general sense." Sira v. Morton, 380 F.3d 57, 81 (2d Cir. 2004). Indeed, "[t]he question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 278 (2d Cir. 1999).

The law applying and interpreting Davis was not clearly established at the time of the search. As we noted earlier, this court has never adequately defined the meaning of "access" under

-25-

Davis. See Ehrlich, 348 F.3d at 53. Nor have we ever passed on how "substantial" an interest must be to vest a third party with authority to consent to a search over an area in which she has such an interest. And, indeed, it is not even clear what metric we would use to measure substantiality, for it surely cannot depend on the presence or absence of a property right in an area, see Randolph, 547 U.S. at 110-11. Finally, the difference between "access" and "permission to gain access" is also obscure. For instance, the dictionary definition of "access" given by the district court includes "permission to approach." See Webster's Third International Dictionary 11 (1981) (defining access to include "permission, liberty, or ability to enter").

Thus, it was not clear at the time of the search whether the physical access Sines gained by forcibly cutting off the locks to the study satisfied the access requirement of Davis. The fact that Davis distinguishes between access and permission to gain access -- part 2(c) of the test -- could suggest that even though Sines's access was improperly obtained, it nevertheless constituted access within the meaning of the first prong. However, because we have never decided whether physical force is permissible under the access prong, Ehrlich, 348 F.3d at 54, a reasonable officer could not be sure that Sines did not have the requisite access to the study, see also id. at 60 ("Since the issue before us is the existence of qualified immunity, we need

-26-

not delimit the specific boundaries of the access requirement."). Moreover, based on the ambiguity in the law, an officer could have reasonably believed that Sines's suspicion that Moore had hidden her personal effects in his study was sufficient to constitute a substantial interest that could validate her consent. And "[i]f the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense." Saucier, 533 U.S. at 205.

In concluding that, for purposes of qualified immunity, the Deputies could have reasonably believed that Sines had authority to consent to the search, we note that this analysis is distinct from that in Part I.A., in which we concluded that, for purposes of determining whether there had been a constitutional violation, common understanding could not have supported a belief that Sines had authority to consent. The latter concerns the question of whether the search itself was unreasonable, in violation of the Fourth Amendment (i.e., the first part of the qualified immunity test), based on common social understanding as clarified in Randolph; the former concerns the question of whether the officers' belief in the lawfulness of their conduct was unreasonable, thereby precluding a qualified immunity defense (i.e., the second part of the qualified immunity test), based on the state of the existing law, which of course pre-dated Randolph. In Anderson v. Creighton, a warrantless search case,

the Supreme Court highlighted the distinction between these two analyses and noted that it was possible for officers to have conducted an unreasonable search based on a reasonable mistaken belief.  483 U.S. 635, 643-44 (1987) (suggesting that it is possible "to say that one 'reasonably' acted unreasonably"); see also Saucier, 533 U.S. at 202 ("In Anderson, . . . we rejected the argument that there is no distinction between the reasonableness standard for warrantless searches and the qualified immunity inquiry.").

Thus, in this case, we conclude that the Deputies acted unreasonably when they searched the study because "no . . . authority [to consent] could sensibly be suspected."  Randolph, 547 U.S. at 112.  However, we also conclude that because the law was unclear, the Deputies could reasonably have believed that Sines had access and a substantial interest and therefore had authority to consent to the search.  Cf. Saucier, 533 U.S. at 203 ("We acknowledged that there was some 'surface appeal' to the argument that, because the Fourth Amendment's guarantee was a right to be free from 'unreasonable' searches and seizures, it would be inconsistent to conclude that an officer who acted unreasonably under the constitutional standard nevertheless was entitled to immunity because he 'reasonably' acted unreasonably.  This superficial similarity, however, could not overcome . . . our history of applying qualified immunity analysis to Fourth

-28-

Amendment claims against officers." (internal quotation marks and citation omitted)).

Because we believe that, at the time of the search, the law was not clearly established as to whether Sines had authority to consent to a search of the study, Deputies Andreno and Palmer are entitled to qualified immunity. We therefore do not need to decide whether the law governing searches purportedly justified by the exigency of the circumstances was clearly established at the time the Deputies searched Moore's study.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is REVERSED. The case is REMANDED to the district court so that it may enter summary judgment in defendants' favor.