# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2008

(Submitted: October 15, 2008                    Decided:  April 24, 2009)

Docket No.  07-4509-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

*Appellee*

v.

KEVIN McGEE,

*Defendant-Appellant*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: LEVAL, KATZMANN, and LIVINGSTON, *Circuit Judges*.

Defendant appeals from conviction following a jury trial in the United States District Court for the Western District of New York (Siragusa, *J.*) for possession of firearms by a convicted felon, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2).   The defendant contends his conviction should be overturned because it was obtained by use of evidence seized during an illegal warrantless search of his residence.  Because the defendant's live-in girlfriend, who consented to the police search, had authority to occupy the premises, despite having been temporarily dispossessed of her key to the house as part of the defendant's ruse to keep her from leaving him, the Court of Appeals (Leval, *J.*) holds the defendant's motion to suppress the evidence was properly denied.

1

JAMES P. VACCA, Rochester, N.Y., for *Defendant-Appellant*.

MONICA J. RICHARDS, Assistant United States Attorney *for* Terrance P. Flynn, United States Attorney for the Western District of New York, Buffalo, N.Y., for *Appellee*.

LEVAL, *Circuit Judge*:

Defendant Kevin McGee, appeals from a judgment of conviction in the United States District Court for the Western District of New York (Siragusa, *J.*) after a jury trial finding the defendant guilty of one count of possession of firearms by a convicted felon, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). The incriminating evidence was discovered in the course of a warrantless police search of the defendant's home, done with the consent of the defendant's girlfriend, who lived there with him. This occurred as the result of the girlfriend's request of the police that they assist her in removing her possessions. The district court denied the defendant's motion to suppress the evidence by reason of an alleged violation of the Fourth Amendment. The court also denied the defendant's motion to adjourn the jury trial because of the filing of a superseding indictment four days prior to the start of trial. McGee contends that his girlfriend did not have access to his house and therefore had no authority to consent to the search. He further argues that he was prejudiced by the refusal to adjourn trial to permit him to prepare to defend against the superseding indictment. We reject McGee's contentions. The district court properly recognized his girlfriend's authority to consent to the search, and there was no abuse of discretion in the court's denial of the motion to adjourn. We affirm the judgment of conviction.

## BACKGROUND

On January 9, 2005, an officer of the City of Rochester Police Department responded to a 911 emergency call from Cassandra Ellison, seeking assistance at 357 First Street. As the officer pulled up to the house, he saw a male running away through the backyard and found Ms. Ellison outside the house. Ellison identified the man who ran away as the defendant, Kevin McGee. She told the officer that she lived with McGee in the house, but intended to leave him and had packed her bags to move out. After she had moved her bags out the door and onto the porch, McGee, in order to prevent her from leaving, had grabbed her bags, put them back in the house, locked the door, and taken away her keys. Ellison asked the officer to break down the door so she could retrieve her belongings. The officer refused, but informed her that as a resident of the location, she could break a window to let herself in, as long as she could show proof that she resided there. Ellison showed the officer a piece of mail addressed to her at that location. She then broke a window in the front door, reached in, and unlocked the door.

Once inside, Ellison informed the officer that she had been in a rush to leave and had not been able to pack all her belongings. She requested that he accompany her while she gathered the remainder of her items because she was afraid McGee might return. While retrieving her clothing from the front closet, Ellison informed the officer that McGee had guns hidden in that closet. The officer asked Ellison twice whether he could check the closet, to which she replied, "[G]o right ahead." The officer and his back-up discovered a rifle, three shotguns, ammunition for a handgun, and a bulletproof vest of the type that is used by the police. The officer seized the items and moved them to his police car.

Ellison then asked the officer to accompany her upstairs to retrieve her belongings from the bedroom. While Ellison was removing personal items from a drawer, the officer saw that there were photographs protruding from under the mattress. He asked Ellison's permission to look at them. Ellison handed them to the officer and told him that the individual pictured holding a gun was McGee. The officer then asked Ellison's permission to take the photographs, to which she replied, "Fine, you can take them."

Following his indictment, which alleged unlawful possession of firearms by a convicted felon on or about January 9, 2005, the day of the search, McGee moved to suppress the evidence found at his house. On March 21, 2007, the district court held a suppression hearing. On the basis of the evidence summarized above, the court concluded that Ellison had authority to consent to the search of 357 First Street and had voluntarily consented to the search. The district court also determined, in the alternative, that based on the circumstances, it was reasonable for the officer to believe that Ellison had authority to consent. The court, accordingly, denied the motion.

Four days before trial was to begin, the government filed a superseding indictment, which expanded the time period in which the alleged illegal possession occurred. The original indictment had charged unlawful possession of firearms "[o]n or about the 9th day of January 2005." On May 10, 2007, after learning that a photo of McGee holding a gun was taken by Ellison and that she had written on it, December 1, 2004, as the date when the photograph was taken, the government obtained a new indictment, which charged that the illegal possession of firearms occurred "[o]n or about and between the 1st day of December 2004 and the 9th day of January 2005." The following day, McGee moved to adjourn the trial date, arguing that the new indictment made a major change

in the charges, for which he needed additional time to either move against the superseding indictment and/or to adjust his theory of defense and his witnesses. The court denied this request.

Trial was conducted before a jury, which rendered a guilty verdict. McGee was sentenced to 115 months imprisonment.

## DISCUSSION

McGee bases his appeal on two claims: first, that the court erred in the denial of his motion to suppress the items seized from his residence, and second, that the court abused its discretion in denying his motion to adjourn the trial upon the filing of the superseding indictment. Both claims are without merit.

## I. Denial of Motion to Suppress

A warrantless police search of a defendant's private premises which would otherwise violate the defendant's rights under the Fourth Amendment is lawful if conducted pursuant to the consent, voluntarily given, of another person who has authority to consent by reason of that person's "common authority over or other sufficient relationship to the premises ." *United States v. Matlock,* 415 U.S. 164, 171 (1974). Authority to consent to a search rests on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id*. at 171 n.7.[1]

---

[1] In *Georgia v. Randolph*, 547 U.S. 103 (2006), notwithstanding the police's receipt of consent to search the bedroom of the defendant's house from the defendant's live-in girlfriend, the defendant's advice to the police that he objected to the search took precedence over his girlfriend's consent so that the receipt in evidence against him of

Even if the person giving consent in fact lacked authority to do so, the consent may nonetheless validate the search if the person reasonably appeared to the police to possess authority to consent to the search. The Supreme Court has explained that apparent authority to give consent "must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (alteration in the original) (internal quotation marks omitted). Thus, effective consent to search the defendant's premises can be communicated to the police by a person who had apparent authority to consent, even if that person in fact lacked actual authority. *See Moore v. Andreno*, 505 F.3d 203, 209 (2d Cir. 2007) (asserting in *dictum* that effective consent which validates a search may be given by a person who lacks authority to consent if the person reasonably appears to the officers conducting the search to have authority).

McGee contends that, because he locked Ellison out of the house and took away her key (and the police knew this), Ellison had neither actual nor apparent authority to enter the house, or to give the police consent to enter and search it. He contends that Ellison's consent is analogous to the ineffective consent to search given by the girlfriend in *Moore*. In that case Moore's girlfriend, who lived in his house with him but had no ownership or tenancy interest in it, gave the police consent to enter and search Moore's study after she had cut the lock he had placed on the study door. The police entered the study and there seized contraband upon which basis he was indicted. We ruled

---

the property seized during the search was ruled a violation of the defendant's Fourth Amendment rights. The *Randolph* precedent has no application here as McGee, having fled as the police arrived, did not tell the police he objected to a search.

that the girlfriend's consent was ineffective. We explained that, as Moore had put a lock on the door of his study, intending to exclude her from entering, and the police knew this, the girlfriend had neither actual nor apparent authority to enter the study, or to consent to entry by the police. *Id*. at 210-13. McGee argues that Ellison, having been locked out of McGee's house, similarly had neither actual nor apparent authority to enter it or to authorize the police to enter.

In support of the argument, he asserts that Ellison's consent was invalid under what he characterizes as the stringent "rules concerning third-party consent searches" set forth in *United States v. Davis*, 967 F.2d 84 (2d Cir. 1992). In *Davis*, restating what we had earlier noted in *United States v. Gradowski*, 502 F.2d 563, 564 (2d Cir. 1974), we said that such a person (described as a "third party") validates a search by giving the authorities consent to search "if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." *Davis*, 967 F.2d at 87. Because Ellison had been locked out and therefore did not "access," McGee asserts that her consent did not satisfy the first prong of the *Davis-Gradowski* formulation.[2]

---

[2] McGee misconceives both the meaning and the nature of what was said in *Davis* (and in *Gradowski*). As for the meaning, in *Davis,* after referring to the Supreme Court's holding in *Matlock* upholding a search based on a third party's consent to the search of an area in which another had an expectation of privacy, what we said was, "We have held that a third-party consent to a search will validate the search if two prongs are present." 967 F.2d at 87. We went on to summarize circumstances in which searches had been upheld by our court and the Supreme Court. Neither the *Matlock* nor the *Davis* discussions said that a consent must necessarily conform to the circumstances of those previous holdings to be valid. The meaning of the *Davis* statement was simply that consents given in circumstances that conform to the two-prong pattern have *already* been upheld. Consents falling outside that pattern were not covered by clear holdings. This was not intended to be understood as a statement that, unless a consent conforms to the two prongs, it is invalid.

Furthermore, in describing the *Davis* formulation as a "rule," McGee misconceives the nature of such a statement in a judicial opinion. When a court proclaims a "test," it is not as if Congress had enacted a statute declaring that in the future consents-to-search will be valid in the specified circumstances and no others. Such a formulation by a court is not a rule of law but rather represents the court's attempt, in the course of deciding on the particular set of facts presented to it, to summarize what it believes to be standards governing the issue generally. To

McGee's argument is by no means unreasonable. It is true that Ellison had no formal property interest that afforded her a right to enter. Any access she enjoyed came to her solely as McGee's invitee, and, for the moment at least, McGee had locked her out of the house and taken away her key. McGee thus contends she had no more access to the house than Moore's girlfriend had to his study.

While McGee's argument is respectable, we believe it is mistaken and misperceives the meaning of "access" as used in *Davis*. Whether a so-called "third party," *i.e.,* one whose access depends on the approval of the person who owns the formal right of possession, has *access* to a premises depends on the understandings communicated by the titular owner to that person. The presence or absence of locks on doors can be helpful to the court's discernment of that understanding, but does not directly answer it. For example, if in *Moore* there had been no lock on the study door, but the owner had made clear to his live-in girlfriend that his study was his private place which she was never to enter, we would think the result of the case would have been the same. On those facts, the girlfriend would not have had the permission of the defendant-owner to gain access (as specified in the second prong of the *Davis* formulation), notwithstanding her *ability* to enter the study in violation of the owner's prohibition. Her consent to the search of a premises she had no authorization to enter would not seem to act as an effective waiver of the owner's Fourth Amendment rights (although it might well waive any Fourth Amendment right she had to protest,

the extent the formulation explains why the court ruled in favor of the winning party, the explanation is part of the court's holding, to which the court is expected to adhere under the principle of *stare decisis*. To the extent, however, that the formulation states that on different facts the court would rule otherwise, such discussion is *dictum*. *Dictum* can be of great value in promoting understanding of the law governing the issue, but it does not have the force of law and does not bind the court to adhere in the future to its earlier attempt to summarize.

8

in the event the search done at her invitation uncovered evidence against her). In contrast, suppose the same padlock had been on the door of the study, but her boyfriend had explained to her that he kept it locked only to keep out others, and that she was welcome to enter it at will, needing only to ask him for the key. We would think in those circumstances, she would be found to have *access* to the study as the term is used in *Davis*, and her consent would have been valid. The lock on the door would not have represented an expression of the owner's intent to exclude her from the study. That situation would have much in common with the facts of *Davis*, in which we found that the consent to search a locked trunk given by its owner Cleare was valid, notwithstanding that Cleare had no key, having given the only key to the defendant. *Davis*, 967 F.2d at 87. In short, while the presence or absence of locks and keys can provide important clues as to whether the titular owner has authorized access by the third person who consents to entry by the police, it does not necessarily answer the question.

On the unusual facts of our case, McGee's argument fails. McGee did not lock Ellison out of the house and take away her key with the intention of excluding her from continuing to live in his house with him. By locking the door, he was not saying, "Get out of my house and stay out." To the contrary, McGee locked her bags in the house and locked her out temporarily in an effort to prevent her from leaving the house. Far from seeking to expel her from the house, his conduct was designed to insure that she would continue to reside in it. He was simply trying to put her baggage out of her reach so that she would not depart. While it is true that in doing so he temporarily prevented her from entering the house, that was an incidental consequence of his action rather than his objective. He could equally well, or better, have accomplished his purpose, if he had had the

9

facilities, in another manner that would not have involved locking her out of the house. For example, he might have simply locked her bags in a closet to which she had no key, or removed the bags to another premises, leaving her free to occupy the house. Despite its superficial similarity to *Moore*, we believe the case is in fact substantially unlike *Moore*. The question in each case turns on the meaning of the locked door. The objective of the locked door in *Moore* was to keep Moore's girlfriend out of the premises she invited the police to search. The objective of the locked door in this case was only to separate Ellison from her baggage, so as to prevent her from ceasing to occupy the premises she invited the police to search. We conclude that Ellison had "access" to McGee's house, in the sense in which that term is used in the cases discussing this question. We therefore find that the first prong of the *Davis* formulation is satisfied.[3]

**II. Denial of McGee's Motion to Adjourn Trial Because of the Superseding Indictment**

We find no abuse of discretion in the district court's denial of McGee's motion to adjourn trial by reason of the filing of the superseding indictment a few days before the start of trial. *See United States v. Pascarella*, 84 F.3d 61, 68-69 (2d Cir. 1996). To prevail, McGee "must establish both that the denial of the adjournment was arbitrary, and that it substantially impaired the presentation of his case." *Sequa Corp. v. GBJ Corp.,* 156 F.3d 136, 148 (2d Cir. 1998); *see also id*. at 147-48 (noting that "[w]e are particularly solicitous of a district court's ruling on a motion to

---

[3] McGee further contends that Ellison failed to satisfy the second prong of the *Davis* formulation. We disagree. According to the *Davis* formulation, the second prong can be satisfied in three ways, including if the consenting person has "permission to gain access." *Davis,* 967 F.2d at 87. We believe the second prong was satisfied for the same reasons as explained in the text. Furthermore, because the district court correctly ruled that Ellison had actual authority to consent to the search, we have no need to rule on McGee's additional contention that Ellison also lacked apparent authority to consent.

adjourn the scheduled start of a trial proceeding."). The court's ruling was not arbitrary and did not prejudice McGee by depriving him of adequate opportunity to prepare.

The only change made by the superseding indictment was to expand the time frame of the alleged illegal possession of the firearms. Whereas the original indictment charged McGee with illegal possession of the three firearms found in his house "[o]n or about the 9th day of January 2005," the superseding indictment charged him with the same offense committed "[o]n or about and between the 1st day of December 2004 and the 9th day of January 2005."

Considering all the circumstances, the change in the allegations was not of a significance that required giving the defendant additional time to prepare. Where an indictment charges an offense using the "on or about" formulation to allege the date, the government is not required to prove that the crime occurred on exactly the date named, but only that it occurred on a date that is "reasonably near" to the date stated. *United States v. Nersesian*, 824 F.2d 1294, 1323 (2d Cir. 1987). Long before the filing of the superseding indictment, McGee had been aware that the government had seized, and presumably would introduce, a photograph manually dated December 1, 2004, which showed him holding a gun. McGee, furthermore, made no showing of any reason why the broadening of dates alleged created a need for additional preparation.

McGee seeks support from the Speedy Trial Act, which provides that without the defendant's consent, "the trial shall not commence less than thirty days from the date on which the defendant first appears." 18 U.S.C. § 3161(c)(2). He contends on that basis that the court acted illegally in violation of the statute by denying the continuance he requested. However, in *United States v. Rojas-Contreras*, 474 U.S. 231, 236 (1985), the Supreme Court ruled that this provision did not

categorically mandate a thirty day continuance following the filing of a superseding indictment, but rather left the need for a continuance in those circumstances within the trial judge's discretion to be decided in accordance with "the ends of justice," as authorized by § 3161(h)(8). We find neither error nor abuse of discretion in the trial court's ruling.

## CONCLUSION

The judgment of conviction is affirmed.